IN THE SUPREME COURT OF NORTH CAROLINA

2022-NCSC-100

No. 47PA21

Filed 19 August 2022

PROVIDENCE VOLUNTEER FIRE DEPARTMENT, INC., a North Carolina non-profit corporation

v.

THE TOWN OF WEDDINGTON, a North Carolina municipal corporation, PETER WILLIAM DETER, in his individual and official capacity as Mayor, and WESLEY CHAPEL VOLUNTEER FIRE DEPARTMENT, INC., a North Carolina non-profit corporation

On discretionary review pursuant to N.C.G.S. § 7A-31(a) from a unanimous decision of the Court of Appeals, No. COA19-203, 2020 WL 7974274 (N.C. Ct. App. Dec. 31, 2020), affirming in part and reversing in part an order entered on 27 November 2018 by Judge Daniel A. Kuehnert in Superior Court, Union County, and remanding the case to the trial court. Heard in the Supreme Court on 21 March 2022.

*Christopher Duggan for plaintiff-appellant.*

*Andrew J. Santaniello for defendant-appellee Town of Weddington.*

*Sumrell Sugg, P.A., by Scott C. Hart and Frederick H. Bailey, III, for defendant-appellee Peter William Deter.*

*No brief for defendant-appellee Wesley Chapel Volunteer Fire Department, Inc.*

ERVIN, Justice.

The issue before us in this case is whether actions taken by defendant Town of Weddington, which include entering into three contracts with plaintiff Providence

Volunteer Fire Department, Inc., in order to (1) procure fire protection services for its residents; (2) effectuate renovations to Providence's fire station; and (3) purchase and lease the fire station back to Providence, constituted governmental, rather than proprietary, actions for purposes of the doctrine of governmental immunity with respect to the fraud-related claims that Providence has asserted against the Town. In addition, this case requires us to address whether actions taken by defendant Mayor Peter William Deter, which include the scheduling of a town council meeting and preparing the agenda for that meeting, at which the council voted to terminate the Town's contracts with Providence, were legislative in nature such that Mayor Deter is shielded from liability with respect to Providence's fraud-related claims based upon the doctrine of legislative immunity. After a careful review of the record that is before us in this case in light of the applicable law, we hold that the Town is protected from Providence's fraud-related claims based upon the doctrine of governmental immunity and that Mayor Deter is protected from those claims based upon the doctrine of legislative immunity, so that the trial court erred by failing to dismiss Providence's fraud-related claims. As a result, the decision of the Court of Appeals is affirmed, with this case being remanded to the Court of Appeals for further remand to Superior Court, Union County, for additional proceedings not inconsistent with this opinion.

## I.   Substantive and Procedural History

## A. Substantive Facts

Providence provided fire services to the Town and surrounding areas between 1954 and 2015. On 14 October 2013, Providence and the Town entered into a pair of agreements pursuant to which Providence agreed to continue to provide fire protection services to the Town and its residents: (1) the Fire Suppression Agreement and (2) the Interlocal Agreement.[1] A third agreement contemplated as part of the overall arrangement between Providence and the Town, known as the Sale and Lease-back Agreement, was entered into in August of 2014, after a "lengthy delay" that was intended to ensure that certain Town-funded improvements could be made to Providence's fire station, with the trial court having described these three agreements as "so integrated, one with the other, as to arguably constitute a single, integrated agreement." The Fire Suppression Agreement, which was made a part of the Interlocal Agreement and attached to that document, provided that

> WHEREAS, the Town desires to provide fire protection to its citizens through the resources of the Department, and

> WHEREAS, the Department has undertaken the renovation and improvements of its 8,329 square foot and

---

[1] The factual statements set forth above are based upon the allegations contained in Providence's complaint, which must be viewed in the light most favorable to Providence given that this case is before us based upon the trial court's rulings with respect to the Town's and the Mayor's motions to dismiss for failure to state a claim for which relief can be granted pursuant to N.C.G.S. § 1A-1, Rule 12(b)(6). *See Est. of Long v. Fowler*, 378 N.C. 138, 2021-NCSC-81, ¶ 12 (stating that this Court "accept[s] the allegations in the complaint as true and view[s] them in the light most favorable to the non-moving party" when reviewing the trial court's rulings upon a motion to dismiss for failure to state a claim for which relief can be granted (quoting *Corwin v. British Am. Tobacco PLC*, 371 N.C. 605, 611 (2018))).

> 1500 square foot volunteer fire station buildings located on its 1.259 acres ("the Property") and has incurred certain debt to effect the renovations and improvements; and
>
> WHEREAS, the Town intends to participate in funding the renovations and improvements of the Property and the Department intends to sell and convey all rights and interests in the Property to the Town as security for its participation; and
>
> WHEREAS, the Town desires to insure the stability of the Department through this Agreement; and
>
> WHEREAS, the Department has the ability to provide fire protection to the citizens of the Town and agrees to provide fire protection and fire suppression services throughout the incorporated limits of the Town and its fire district.

The Fire Suppression Agreement further provided that Providence would provide fire protection and emergency medical services to the Town for a period of ten years beginning on 14 October 2013, with this period subject to extension for an additional five-year period in the event that Providence gave notice to the Town six months prior to the date upon which the agreement was to expire. The Fire Suppression Agreement could only be terminated "for cause," which was defined as "the failure of either party to perform the material provisions of this Agreement and [which] shall include, but not be limited to, the failure to meet the required service levels and transparency requirements of the Agreement."

¶ 3 In accordance with the Interlocal Agreement, substantial improvements were to be made to Providence's fire station, Providence was required to satisfy the Town's

increased demand for fire protection services, and the Town would assume the debts incurred by Providence in connection with the improvements to be made to its fire station. Finally, the Sale and Lease-back Agreement provided that Providence's fire station would be sold to the Town for approximately $935,000.00 and leased back to Providence for use as a fire station for a fee of one dollar ($1.00) per year.

¶ 4    In November of 2013, Mayor Deter was elected to serve as the Town's mayor. Providence alleges that, during his campaign, Mayor Deter "concealed [his] intent to terminate the fire district and the [Fire Suppression Agreement] and w[as] supported by [a rival fire department] in order to bring about the termination of the contracts between [Providence] and the town." In addition, Providence alleges that Mayor Deter took a number of actions, including working with Wesley Chapel Volunteer Fire Department, to "create financial instability" for Providence "in order to set up a claim that the [Fire Suppression Agreement] could be terminated 'with cause' based upon manufactured financial instability claims." Among other things, Mayor Deter allegedly acted during 2014 and 2015 to undermine Providence by, among other things, "unilaterally chang[ing] the interpretation of the Interlocal Agreement to reduce the purchase price" of the fire station; creating, and then concealing, a " 'Decision Tree' which contemplated terminating the Interlocal Agreement and [Fire Suppression Agreement] and transferring the property to" Wesley Chapel Volunteer Fire Department; and directing the Town's attorney "to examine ways to dissolve the

Fire District" in order to avoid paying damages to Providence. According to Providence,

> the Town's fraud was designed to (1) first encourage [Providence] to deed its long-owned Property, including the fire department building, to the Town since [Providence] would get its Property back anyway via a long term (and previously contemplated by the 2013 Interlocal Agreement) lease. This was done when the Town in reality was surreptitiously planning how best to (2) break the lease after it was entered into (together with the other agreements) rather than honor the lease and the other contracts. . . .
>
> [Providence] contends the Town's actions at this time, guided by Mayor Deter, were intended to put the Town in the best position to most easily terminate the lease (and Interlocal Agreement) together with the Fire Suppression Agreement as soon as possible, and with the ultimate goal and intent of:
>
> > i. putting [Providence] out of its non-profit fire suppression and emergency medical services business;
> >
> > ii. having the Town end up owning all, or substantially all, of [Providence]'s real estate and other personal property;
> >
> > iii. all without paying just compensation to [Providence] for said property; and then,
> >
> > iv. transferring [Providence]'s property and service agreement to Defendant Wesley Chapel Volunteer Fire Department.

On 20 August 2014, the Town paid approximately $935,000.00 for the property upon which the fire station was located and obtained title to that property by means

of a quitclaim deed. On 28 April 2015, a special meeting of the town council was held during which the council voted to terminate the Fire Suppression Agreement, a decision which had the effect of terminating the Interlocal Agreement as well. According to Providence, the Town "terminated the Lease, forced [Providence] from the [fire station] property, forced [Providence] out of business, and . . . leased with an option to purchase the [fire station] by deed to Wesley Chapel Volunteer Fire Department."

**B. Procedural History**

On 4 June 2015, Providence filed a complaint asserting various claims for relief against the Town. On 25 August 2015, the trial court entered orders allowing Providence to amend its complaint; denying, in part, the Town's motion to dismiss Providence's complaint based upon governmental immunity; and granting a preliminary injunction in favor of Providence. The Town noted an appeal to the Court of Appeals from the trial court's orders.

On 18 April 2017, the Court of Appeals filed an opinion in which it affirmed the trial court's decision to allow Providence to amend its complaint; affirmed the trial court's decision to deny the Town's dismissal motion based upon governmental immunity; and reversed the trial court's decision to grant Providence's preliminary injunction motion. *Providence Volunteer Fire Dep't v. Town of Weddington*, 253 N.C. App. 126, 140–41 (2017). On 6 September 2017, Providence filed another motion to

amend its complaint, which the trial court denied. On 26 March 2018, Providence voluntarily dismissed its complaint against the Town without prejudice pursuant to Rule 41 of the North Carolina Rules of Civil Procedure. *See* N.C.G.S. § 1A-1, Rule 41(a) (2021).

¶ 8 On 27 March 2018, Providence filed a new complaint asserting multiple claims against the Town, Mayor Deter, and the Wesley Chapel Volunteer Fire Department sounding in breach of contract, fraud in the inducement and actual fraud, deprivation of property and liberty without due process, and tortious interference with contract. On 1 June 2018, Mayor Deter filed a motion to dismiss and an answer to Providence's complaint in which he asserted that Providence's claims against him should be dismissed on the grounds that (1) Providence did not state a claim upon which relief could be granted; (2) Providence failed to allege facts tending to show that Mayor Deter had deprived Providence of a federal right; (3) Mayor Deter was not a real party in interest to the contracts at issue in this case; (4) Providence's claims were barred by res judicata, collateral estoppel, and the law of the case doctrine; and (5) Mayor Deter was protected by governmental immunity, legislative immunity, public official immunity, and qualified immunity. On 16 July 2018, the Town filed a motion to dismiss and an amended answer to Providence's complaint in which it asserted that Providence's complaint was subject to dismissal pursuant to N.C.G.S. § 1A-1, Rules 12(b)(1), 12(b)(2), 12(b)(6) and 54, on the grounds that (1) the Town was entitled to

governmental immunity; (2) the assertion of Providence's claims was precluded by the law of the case doctrine; (3) Providence's claims were barred by the doctrine of qualified immunity; and (4) Providence had failed to state a claim for which relief could be granted. On 1 November 2018, Providence filed a motion seeking leave to amend its complaint and presented a proposed amended complaint to the trial court.

¶ 9 On 27 November 2018, the trial court entered an order addressing Providence's request to amend its complaint, the Town's dismissal motion, and Mayor Deter's dismissal motion. Among other things, the trial court found that Providence's complaint stated a claim for relief against the Town, but not Mayor Deter, for breach of contract. In addition, the trial court found that Providence's complaint stated a claim for relief sounding in fraud against the Town and that its fraud-related claims were not barred by the doctrine of governmental immunity given that the Town was acting in a proprietary, rather than a governmental, capacity, stating that

> 13. The [c]ourt . . . determines that the weight and sufficiency of the evidence shows that the alleged tortious conduct of Defendant Town, under the particular circumstances of this action, arose from an activity that was proprietary in nature.
>
> > a. . . . [T]his proprietary nature of the Town's activity herein includes: the allegedly-fraudulent negotiation and execution of Defendant Town's purchase of the Property and lease-back of the Property to [Providence], which included the insertion of a key provision or provisions making a breach of the [Fire Suppression Agreement] also a breach of the

lease, designed to open the door for Defendant Town to, shortly after execution of the deed and lease-back, manufacture an unsubstantiated and subjective breach. This alleged a breach of the [Fire Suppression Agreement] and thus the lease was subjective enough to possibly allow the Town to obtain the real and personal property of [Providence], having substantial value,

    i.   without just compensation as provided for under our state and federal constitutions;

    ii.   without payment of adequate consideration; and,

    iii. in laymen's terms, allowing the town to fraudulently obtain all this long-standing fire department property.

14. The Court is not persuaded that this specific transaction . . . has been designated as governmental by the General Assembly or that the undertaking is one in which only a governmental agency could engage. At first glance this activity might appear to be all about fire suppression and emergency services, and thus governmental in nature, by virtue of Chapter 69 of our General Statutes or even N.C.G.S. § 160A-291 which authorizes, but does not require a town to provide for its own fire protection. Yet, in this case, [Providence]'s allegations are not that Defendant Town was entering the lease for a legitimate governmental purpose, but rather the Town was attempting to obtain significant and valuable property in a proprietary manner, by way of a sale and lease back, of [Providence]'s property in a fraudulent manner. Indeed, the purchase and lease-back of any real property can be performed both privately and publicly. But if a Town is to acquire private property, it must do so properly, legally, and in accord with applicable law, not fraudulently, as alleged by [Providence]. Furthermore, the affidavits submitted by Defendant Town do not provide

> sufficient evidence controverting [Providence]'s allegations that the specific actions . . . were proprietary in nature.
>
> 15.    The Court is also not persuaded that this action must follow the same result as that in *Meinck v. City of Gastonia*, [371 N.C. 497 (2018)]. . . .
>
> 16.    The Court therefore concludes that the factors espoused in *Estate of Williams v. Pasquotank County Parks & Rec. Dep't*, 366 N.C. 195, 198–203 . . . (2012), have been met, . . . and Defendant Town is not entitled to dismissal of [Providence]'s fraud claim based upon governmental immunity at this stage of the proceedings.

After determining that Providence's fraud-related claims against the Town were not barred by the doctrine of governmental immunity, the trial court reached the same result with respect to the legislative immunity defense that Mayor Deter had asserted against Providence's fraud-related claims, stating that:

> 20.    The Court concludes that [Mayor] Deter in his individual capacity, at this early stage of the litigation, is not entitled to the protection afforded by legislative immunity. . . . [Providence]'s allegations show that [Mayor] Deter was not engaged in the process of adopting prospective, legislative-type rules, but instead was engaged in activities wherein his alleged actions served to single out [Providence] for termination of the contractual agreements[.]

Finally, in addressing Providence's substantive due process claims alleging deprivation of property in violation of 42 U.S.C. § 1983 and the North Carolina Constitution, the trial court allowed those claims to move forward against the Town

and against Mayor Deter in his individual capacity. The Town, Mayor Deter, and Providence noted appeals from the trial court's order to the Court of Appeals.

¶ 10 On 31 December 2020, the Court of Appeals filed an opinion in which it held, among other things, that the trial court had erred by denying the Town's motion to dismiss Providence's fraud-related claims against the Town because the Town was entitled to governmental immunity and that the trial court had erred by denying Mayor Deter's motion to dismiss the fraud-related claims that Providence had asserted against him on the basis of legislative immunity. *Providence Volunteer Fire Dep't, Inc. v. Town of Weddington*, No. COA19-203, 2020 WL 7974274, at **3–4 (N.C. Ct. App. Dec. 31, 2020). As an initial matter, the Court of Appeals noted that governmental immunity "covers *only* the acts of a municipality or a municipal corporation *committed pursuant to its governmental functions*," *Providence*, 2020 WL 7974274, at **3 (quoting *Evans ex rel. Horton v. Hous. Auth.*, 359 N.C. 50, 53 (2004)), and concluded that "the act of a town entering into contracts for the provision of firefighting services is governmental in nature[,]" *id*. The Court of Appeals based its determination that entering into contracts for the provision of fire protection services was governmental, rather than proprietary, in nature upon N.C.G.S. § 69-25.6, which empowers municipal corporations "to make contracts to carry out the purposes of this Article [concerning rural fire protection]" and upon N.C.G.S. § 69-25.8, which allows any county or municipal corporation that is "performing any of the services

authorized by this Article" to "be subject to the same authority and immunities as . . . a municipal corporation would enjoy in the operation of a fire department within its corporate limits." *Id.*; *see* N.C.G.S. §§ 69-25.6, -25.8 (2021). Finally, the Court of Appeals noted that, while the Town was immune from Providence's fraud-related claims, the same was not true with respect to the breach of contract claim that Providence had asserted against the Town. *Providence*, 2020 WL 7974274, at \*\*3.

¶ 11 Similarly, the Court of Appeals held that the trial court should have dismissed the fraud-related claims that Providence had lodged against Mayor Deter in light of the fact that those claims rested upon actions that Mayor Deter had taken in a legislative capacity following his election as Mayor. *Providence*, 2020 WL 7974274, at \*\*4. After pointing out that it had previously held that elected officials enjoy legislative immunity if (1) "they were acting in a legislative capacity at the time of the alleged incident; and (2) their acts were not illegal acts," *Providence*, 2020 WL 7974274, at \*\*3 (quoting *Vereen v. Holden*, 121 N.C. App. 779, 782 (1996)), and that this "immunity may extend to 'voting, . . . and . . . every other act resulting from the nature, and in the execution, of the office,'" (alterations in original) (quoting *Stephenson v. Town of Garner*, 136 N.C. App. 444, 450 (2000)), the Court of Appeals cited *Bogan v. Scott-Harris*, 523 U.S. 44 (1998), in which the United States Supreme Court held that elected city council members were entitled to legislative immunity when they voted for an ordinance which terminated the plaintiff's employment, with

this action being "undoubtedly legislative" given that it constituted "a discretionary, policymaking decision implicating the budgetary priorities of the city and the services the city provides to its constituents[,]" *Providence*, 2020 WL 7974274, at **4 (quoting *Bogan*, 523 U.S. at 55–56). In deciding that Mayor Deter's allegedly tortious acts had occurred while he was acting in a legislative capacity, the Court of Appeals held that, even though "some of the alleged actions happened before the Mayor's election," Providence's fraud-related claims also rested upon "the legislative actions that occurred after his election," a series of events that included the town council's vote to terminate the Town's fire services contract with Providence. *Id*. (emphasis omitted). This Court allowed Providence's request for discretionary review of the Court of Appeals' decision.

## II. Analysis

### A. Standard of Review

Interlocutory orders such as those at issue in this case are not immediately appealable unless they affect a substantial right. N.C.G.S. § 7A-27(b)(3)(a) (2021). An interlocutory appeal from an order addressing a governmental entity's immunity claim is immediately appealable "because [immunity] represents a substantial right." *Craig v. New Hanover Cnty. Bd. of Educ.*, 363 N.C. 334, 338 (2009). This Court reviews a trial court's decision to grant or deny a motion to dismiss based upon the doctrine of governmental or legislative immunity using a de novo standard of review.

*See White v. Trew*, 366 N.C. 360, 362–63 (2013) (reviewing an appeal from a trial court order denying "a motion to dismiss that raises sovereign immunity as grounds for dismissal" utilizing a de novo standard of review).

**B. Governmental Immunity for the Town of Weddington**

In attempting to persuade us to reverse the Court of Appeals' decision in this case, Providence begins by arguing that the Town is not shielded from the fraud-related claims that Providence has asserted against it on the basis of governmental immunity on the grounds that the challenged actions in which the Town allegedly engaged were proprietary, rather than governmental, in nature. According to Providence, the Town would be "hard pressed to provide to this Court an action which is more 'proprietary' then [sic] the bargain and exchange of real property," with the Town's actions being clearly proprietary given that it received a "significant economic benefit" by "acquir[ing] an asset worth over $1,595,000.00 for an investment of only $935,000.00." In Providence's view, the trial court correctly found that the complaint adequately alleged that the Town's actions in executing an agreement providing for the sale and lease-back of the fire station was proprietary in nature, with the Town's "insertion of a key provision . . . making a breach of the [Fire Services Agreement] also a breach of the lease [being] designed to open the door for Defendant Town to, shortly after execution of the deed and lease-back, manufacture an unsubstantiated and subjective breach."

Providence argues that a governmental action is proprietary in the event that the governmental entity operates as a private corporation or, in other words, when "the activity is commercial or chiefly for the private advantage of the compact community," citing *Britt v. City of Wilmington*, 236 N.C. 446, 450 (1952). According to Providence, the acquisition of the fire station was "chiefly for the benefit of the compact community of the Town of Weddington" rather than for the benefit of "the State as a whole" and that, "regardless of whether the ultimate result [wa]s some public purpose, i.e., fire safety, if the activities . . . are done through the Town's commercial function, the said actions are proprietary."

In addition, Providence asserts that, in evaluating whether a municipality's actions are proprietary, rather than governmental, in nature, a reviewing court must examine each aspect of the municipality's interactions with a private entity individually in the course of determining which aspects of the transaction are proprietary and which are governmental. *See City of Gastonia v. Balfour Beatty Constr. Corp.*, 222 F. Supp. 2d 771, 774 (W.D.N.C. 2002). In support of this assertion, Providence directs our attention to *Town of Sandy Creek v. E. Coast Contracting, Inc.*, 226 N.C. App. 576, 581–82 (2013), in which the Court of Appeals distinguished between the initial steps involved in constructing a sewer system, which included making governmental decisions such as "whether to construct a sewer system or where to locate the sewer system," and the latter stages of that process, which

included entering into and administering a construction contract, before holding that "a local governmental unit acts in a proprietary function when it contracts with engineering and construction companies, regardless of whether the project under construction will be a governmental function once it is completed."  In Providence's view, the trial court in this case correctly applied the factors enunciated in *Estate of Williams ex rel. Overton v. Pasquotank Cnty. Parks & Recreation Dep't*, 366 N.C. 195, 196 (2012), in the course of determining that "the purchase and lease back of any real property can be performed both privately and publicly" and that nothing in the relevant statutory provisions suggests that the General Assembly intended to designate the purchase and lease-back of the property upon which a fire station is situated as a governmental function.  Finally, Providence contends that, in the event that we believe that we must look to "additional factors" in order to determine whether the Town's actions were proprietary, rather than governmental, in nature, it should consider that the function of "entering into purchase and lease back documents is not one traditionally provided by the government," that "the Town's actions were done to obtain a significant and valuable property," and that "the Town failed to provide any evidence to rebut [Providence]'s allegations."

¶ 16        In seeking to persuade us to affirm the Court of Appeals' decision, the Town begins by arguing that the purchase and lease-back of the fire station cannot be "viewed in a vacuum as a standalone property purchase" and that the contractual

provisions relating to the fire station constituted "an integral part of a larger agreement for the provision of fire protection services" that was "necessary for [the Town] to provide fire protection to its citizens" and that the ultimate purpose of the overall transaction was governmental, rather than proprietary, in nature. The Town argues that, if its actions are viewed as the provision of fire protection services, a proper application of the test enunciated in *Estate of Williams* establishes that it was acting in a governmental, rather than a propriety, manner in the course of its dealings with Providence given that the General Assembly has designated the provision of fire protection services as a governmental action and given that the Town does not charge a separate fee for providing such services.

¶ 17      In the Town's view, the sale and lease-back of the property upon which the fire station is located cannot be separated out from the rest of the agreements between the Town and Providence, with it being necessary to examine the relationship between the parties as a single governmental action, citing *Meinck v. City of Gastonia*, 371 N.C. 497, 517 (2018), in which this Court held that the municipality's action in "leasing . . . property to the Art Guild so as to promote the arts for the purpose of redeveloping and revitalizing the downtown area was a governmental[,]" rather than a proprietary, function. According to the Town, the Court in *Meinck* "examined the larger picture and the lease as part of a governmental function" rather than "narrowly describ[ing the town's] actions as a commercial property lease." As a

result, the Town posits that the Fire Suppression Agreement, the Interlocal Agreement, and the Sale and Lease-back Agreement constituted integrated agreements that were necessary in order for the Town to carry out the governmental function of providing fire protection services and that, "[w]hen the relationship between the parties is viewed in its entirety as in *Meinck*," the purchase of the fire station cannot be fairly seen as a standalone proprietary real estate transaction and should be understood as part of an overall arrangement for providing fire suppression services.

¶ 18        This Court has recently held that the doctrine of governmental immunity

> renders local governments such as counties and municipal corporations "immune from suit for the negligence of [their] employees in the exercise of governmental functions absent waiver of immunity." *Meyer v. Walls*, 347 N.C. 97, 104 . . . (1997) (quoting *State ex rel. Hayes v. Billings*, 240 N.C. 78, 80 . . . (1954)). Although "[t]he State's sovereign immunity applies to both its governmental and proprietary functions," the "more limited governmental immunity covers only the acts of a municipality or a municipal corporation committed pursuant to its governmental functions." *Evans v. Hous. Auth. of City of Raleigh*, 359 N.C. 50, 53 . . . (2004) (quoting *Guthrie v. N.C. State Ports Auth.*, 307 N.C. 522, 533 . . . (1983)). In other words, while governmental immunity protects units of local government from suit for "acts committed in [their] governmental capacity," if the entity in question "undertakes functions beyond its governmental and police powers and engages in business in order to render a public service for the benefit of the community for a profit, it becomes subject to liability for contract and in tort as in case of private corporations." *Id.* (quoting *Town of Grimesland v. City of Washington*, 234 N.C. 117, 123 . . . (1951)).

*State v. Kinston Charter Acad.*, 379 N.C. 560, 2021-NCSC-163, ¶ 22 (first, fourth, and seventh alterations in original). In *Estate of Williams*, this Court took the "opportunity to restate our jurisprudence of governmental immunity[,]" 366 N.C. at 196, and began that process by reciting the rule set out in *Britt v. City of Wilmington*, 236 N.C. 446, 450 (1952), to the effect that governmental immunity "covers only the acts of a municipality or a municipal corporation committed pursuant to its governmental functions[,]" *Est. of Williams*, 366 N.C. at 199 (emphasis omitted) (quoting *Evans*, 359 N.C. at 53), and does not "apply when the municipality engages in a proprietary function[,]" *id*. at 199. In addition, we noted that this Court has "long held that a 'governmental' function is an activity that is 'discretionary, political, legislative, or public in nature and performed for the public good in behalf of the State rather than for itself,' " while a proprietary function "is one that is 'commercial or chiefly for the private advantage of the compact community.' " *Id.* (quoting *Britt*, 236 N.C. at 450). In other words, we stated that,

> [w]hen a municipality is acting "in behalf of the State" in promoting or protecting the health, safety, security, or general welfare of its citizens, it is an agency of the sovereign. When it engages in a public enterprise essentially for the benefit of the compact community, it is acting within its proprietary powers.

*Id*. at 200 (quoting *Britt*, 236 N.C. at 450–51).

Our opinion in *Estate of Williams* adopted a three-step method of analysis for use in determining whether a municipality's action was governmental or proprietary in nature. The first step, or "threshold inquiry[,] in determining whether a function is proprietary or governmental is whether, and to what degree, the legislature has addressed the issue." *Id.* If an action "has been designated as governmental or proprietary in nature by the legislature," that is the end of the inquiry; if not, the second step is to determine whether the activity "is one in which only a governmental agency could engage" or provide, in which case "it is perforce governmental in nature." *Id.* at 202 (emphasis omitted). As we noted, the second step in the required analysis

> has limitations in our changing world. Since we first declared in *Britt*, over half a century ago, that an activity is governmental in nature if it can only be provided by a governmental agency, many services once thought to be the sole purview of the public sector have been privatized in full or in part. Consequently, it is increasingly difficult to identify services that can only be rendered by a governmental entity.
>
> Given this reality, when the particular service can be performed both privately and publicly, the inquiry involves consideration of a number of additional factors, of which no single factor is dispositive. Relevant to this inquiry is whether the service is traditionally a service provided by a governmental entity, whether a substantial fee is charged for the service provided, and whether that fee does more than simply cover the operating costs of the service provider. We conclude that consideration of these factors provides the guidance needed to identify the distinction between a governmental and proprietary activity. Nevertheless, we note that the distinctions between proprietary and governmental functions are fluid

and courts must be advertent to changes in practice. We
therefore caution against overreliance on these four
factors.

*Id*. at 202–03 (footnotes omitted).

¶ 20        We applied the test enunciated in *Estate of Williams* in *Meinck*, in which the
plaintiff sued the City of Gastonia for injuries that she sustained after falling on the
steps of a City-owned building that had been purchased in an attempt to revitalize
the downtown area and that was being leased to nonprofit art groups and the Gaston
County Art Guild for the purpose of "bring[ing] artists into the downtown" area on
the theory that "that the downtown area would thus become more attractive for
businesses and people." 371 N.C. at 498. The Art Guild, in turn, subleased portions
of the building to individual artists, with the City being "responsible for maintaining
the exterior of the premises" and having "the right to inspect the property at any
time." *Id*. at 499. Although the City retained 90% of rental payments made by the
artists, it did not make a profit on the building or seek "to make a profit from the
lease with the Art Guild." *Id*.

¶ 21        In applying the test enunciated in *Estate of Williams* to the facts at issue in
*Meinck*, we began by undertaking the "threshold inquiry" of determining whether the
General Assembly had deemed actions such as those in which the City had engaged
to be governmental or proprietary in nature and noted that the legislature had
authorized municipalities to engage in redevelopment projects in blighted areas in

accordance with the "Urban Redevelopment Law," Article 22 of Chapter 160A of the General Statutes. *Id.* at 504–05. The Urban Redevelopment Law authorized and encouraged "the acquisition, preparation, sale, sound replanning, and redevelopment" of "blighted areas" by local governments and encouraged municipalities "to purchase, obtain options upon, acquire by gift, grant, devise, eminent domain or otherwise, any real or personal property or any interest therein, together with any improvements thereon, necessary or incidental to a redevelopment project." *Id.* at 507–08 (quoting N.C.G.S. § 160A-502 (2017)). This Court noted that,

> even when the legislature has not directly resolved whether a specific activity is governmental or proprietary in nature, a legislative provision addressing the activity may still be relevant—in conjunction with the other *Williams* factors—to a determination of whether an activity is governmental, particularly if the statutory language suggests a significant statutory indication that the activity is a governmental function.

*Id.* at 512 (cleaned up).

On the other hand, we also concluded that the General Assembly "ha[d] not deemed all urban redevelopment and downtown revitalization projects governmental functions that are immune from suit" or "directly resolved" the issue of whether the City's lease of the building was governmental, rather than proprietary, in nature. *Id.* at 513. For that reason, we went on to address the additional factors mentioned in *Estate of Williams*. *Id.* First, the Court addressed whether the governmental action at issue in *Meinck* was one "in which only a governmental agency could engage" and

held that North Carolina law did "not preclude private entities from engaging in redevelopment projects and downtown revitalization activities," so that a private entity "could conceivably engage in the same activity." *Id.* at 514 (emphasis omitted). In examining "whether the service is traditionally [one] provided by a governmental entity," we found no evidence that the service was not traditionally performed by the government. *Id.* at 514–15. In addition, in examining "whether a substantial fee is charged for the service provided and whether that fee does more than simply cover the operating costs of the service provider," we determined that the City sustained net losses of $11,489.03 and $18,072.56, respectively, during the first two years in which it owned and operated the building and concluded that the building was not providing the City with a profit. *Id.* (quoting *Est. of Williams*, 366 N.C. at 202–03). Finally, we noted the "decidedly noncommercial nature of defendant's undertaking" and the fact that "[a]rt occupies a unique role in our society and our state." *Id.* at 516.

¶ 23 At the conclusion of our analysis, we held that the City's action in "leasing the property to the Art Guild so as to promote the arts for the purpose of redeveloping and revitalizing the downtown area" was governmental, rather than proprietary, in nature based upon an analysis of all of the relevant factors, particularly given "the statutory indications that urban redevelopment activities undertaken to promote the health, safety, and welfare of North Carolina citizens are governmental functions,

and the legislative determination that urban blight 'cannot be effectively dealt with by private enterprise' alone." *Id.* at 517. As part of this process, we emphasized that "the proper designation of a particular action of a county or municipality" as governmental or proprietary "is a fact intensive inquiry . . . and may differ from case to case." *Id.* at 517–18 (alteration in original).

¶ 24    In applying the test enunciated in *Estate of Williams* to the facts before us in this case, the "threshold inquiry" that we must undertake is whether the General Assembly has defined the relevant municipal action as governmental or proprietary in nature. According to the parties, four statutory provisions appear to have some bearing upon this aspect of the required analysis. First, the parties discuss N.C.G.S. § 69-25.5, which governs "[m]ethods of providing fire protection" services in Rural Fire Protection Districts and provides that "the board of county commissioners shall . . . provide fire protection for the district—(1) [b]y contracting with any incorporated city or town, with any incorporated nonprofit volunteer or community fire department, or with the Department of Agriculture and Consumer Services to furnish fire protection." Secondly, the parties refer to N.C.G.S. § 69-25.6, which appears in the same article as N.C.G.S. § 69-25.5 and provides that "[m]unicipal corporations are hereby empowered to make contracts to carry out the purposes of this Article." Thirdly, the parties address N.C.G.S. § 69-25.8, which governs the "[a]uthority,

rights, privileges and immunities of counties" or other local government entities which perform services within Rural Fire Protection Districts and provides that

> [a]ny county, municipal corporation or fire protection district performing any of the services authorized by this Article shall be subject to the same authority and immunities as a county would enjoy in the operation of a county fire department within the county, or a municipal corporation would enjoy in the operation of a fire department within its corporate limits[.]

N.C.G.S. § 69-25.8. Finally, the parties mention N.C.G.S. § 160A-291, which provides that a municipality "is authorized to appoint a fire chief; to employ other [firefighters]; to establish, organize, equip, and maintain a fire department; and to prescribe the duties of the fire department."

¶ 25 The trial court and the Court of Appeals reached opposite conclusions about the degree to which the relevant statutory provisions address whether the function of entering into contracts, including one involving the sale, lease-back, and purchase of real estate, for the ultimate purpose of providing fire protection services is a governmental or proprietary activity. On the one hand, the trial court was "not persuaded that this specific transaction . . . has been designated as governmental by the General Assembly or that the undertaking is one in which only a governmental agency could engage." In reaching this conclusion, the trial court determined that the Town's conduct in entering into the relevant contracts as alleged in the complaint was proprietary on the theory that, while, "[a]t first glance this activity might appear

to be all about fire suppression and emergency services . . . by virtue of Chapter 69 of our General Statutes or even N.C.G.S. § 160A-291," Providence had alleged "not that Defendant Town was entering the lease for a legitimate governmental purpose, but rather [that] the Town was attempting to obtain significant and valuable property in a proprietary manner, by way of a sale and lease back, of [Providence]'s property in a fraudulent manner." The Court of Appeals, on the other hand, determined that, in light of its reading of N.C.G.S. § 69-25.6 and N.C.G.S. § 69-25.8, the General Assembly had intended that "entering into contracts for the provision of firefighting services" would be a governmental, rather than a proprietary, action.

¶ 26        Assuming, without deciding, that the initial step of the analysis required by *Estate of Williams* is not determinative of the inquiry that we must undertake in this case, we proceed to the next step, at which we are required to determine whether the activity "is one in which only a governmental agency could engage." 366 N.C. at 202 (emphasis omitted). Although private fire departments such as Providence are authorized to provide fire protection services to rural fire districts, it is also clear that such arrangements are often organized and funded by a town or other local government entity. As a result, at an absolute minimum, it is clear that, while private entities are authorized to provide fire service within municipal boundaries, they are frequently acting on behalf of local governmental entities when they do so.

¶ 27    In examining the "additional factors" mentioned in *Estate of Williams*, including "whether the service is traditionally . . . provided by a governmental entity, whether a substantial fee is charged for the service provided, and whether that fee does more than simply cover the operating costs of the service provider," 366 N.C. at 202 (footnotes omitted), we hold that each of these factors clearly tends to suggest that the activities in which the Town was engaged in the course of its dealings with Providence were governmental, rather than proprietary, in nature. Fire protection services are traditionally provided by the government, either directly or through contractual arrangements with private entities as authorized by N.C.G.S. § 160A-291 and Chapter 69 of the General Statutes. In addition, the Town does not currently charge a fee to its residents for fire protection services and does not make a profit in connection with the provision of such services.

¶ 28    As a result, as was the case in *Meinck*, we hold that, even if the General Assembly has not "directly resolved" the issue of whether entering into contractual arrangements for the provision of fire protection services is governmental or proprietary in nature, 371 N.C. at 512 (quoting *Est. of Williams*, 366 N.C. at 202), N.C.G.S. § 160A-291 and Chapter 69 of the General Statutes represent "a significant 'statutory indication'" that the activity is governmental, *id*. (quoting *Est. of Williams*, 366 N.C. at 200). In addition, as was the case with the downtown revitalization process at issue in *Meinck*, the provision of fire protection services is "decidedly

noncommercial" in nature given that, rather than being an activity that tends to generate a significant profit, such services have traditionally been provided by governmental entities for the purpose of protecting the safety and well-being of local residents. *Id.* at 516 (quoting *Est. of Williams*, 366 N.C. at 203). Finally, as was the case in *Meinck*, we decline to differentiate between the purchasing and leasing of real estate for the purpose of providing fire protection services from the other activities involved in the provision of such services, given that both actions were part of the same transaction and had the effect of accomplishing the same governmental purpose.

¶ 29        In reaching the last of these conclusions, we decline Providence's invitation to divide the activity in which the Town was engaged into multiple, separate pieces and to treat the sale and lease back provisions of the contracts between the parties as a standalone real estate transaction that must be considered separate and apart from the remainder of the agreement between the parties. As the trial court recognized, even though the Fire Suppression Agreement, the Interlocal Agreement, and the Sale and Lease-back Agreement were "delineated as separate contracts and executed at different times," they were, "in actuality, so integrated, one with the other, as to arguably constitute a single, integrated agreement." In essence, the contracts between the parties reflect the undisputed fact that the fire station that Providence intended to utilize to provide fire protection services to the residents of the Town

needed renovation, that the Town had agreed to pay for those renovations and assume a portion of Providence's debt, and that the Town had entered into the sale and lease back arrangement with Providence for the purpose of securing its investment. As a result, given that Providence would need a fire station in order to provide service to the Town and given that the transaction reflected in the Sale and Lease-Back Agreement set out the manner in which the needed fire station would be provided, we are unable to divorce the provisions of the Sale and Lease-Back Agreement from the remainder of the overall transaction between the parties, which was clearly intended to ensure that the residents of the Town received fire protection services.

¶ 30      A municipality cannot provide fire suppression services without some degree of preparation, such as ensuring that the facilities and equipment needed to permit effective fire suppression functions to be performed by Town directly or an entity with which the Town had contracted are available. Put another way, more is necessarily involved in the provision of fire protection services than the immediate act of fire suppression. Under the logic of Providence's position, a municipality's decision to purchase fire protection equipment, such as fire trucks, hoses, and turnout gear, on the commercial market would be rendered proprietary even though the resulting costs were necessarily incurred for the purpose of making a service that units of local government have traditionally provided, that benefits all residents, and that does not

provide an economic return to the municipality, available. Obtaining a fire station for use in providing fire suppression services is not, in our opinion, any different than the procurement of vehicles, hoses, and turnout gear. As a result, for all of these reasons, we hold that the Town's conduct in entering into the Fire Suppression Agreement, the Interlocal Agreement, and the Sale and Lease-back Agreement for the provision of fire protection services was a governmental action that rendered it immune from Providence's fraud-based claims.

## C. Legislative Immunity for the Mayor

¶ 31        In arguing that Mayor Deter was not entitled to the protection of legislative immunity from its fraud-related claims, Providence asserts that the trial court correctly determined that Mayor Deter "was not engaged in the process of adopting prospective, legislative-type rules, but instead was engaged in activities wherein his alleged actions served to single out [Providence] for termination of the contractual agreements." In Providence's view, the Court of Appeals erred in relying upon *Vereen v. Holden*, 121 N.C. App. 779 (1996), in holding that legislative immunity applies to circumstances such as those at issue here, with the burden resting upon Mayor Deter to prove that he is entitled to legislative immunity in light of the relevant facts. In addition, Providence argues that the Court of Appeals failed to analyze the specific facts alleged in its complaint and that its holding that, "because [Mayor] Deter operated in his legislative capacity when he added items to an agenda and abstained

from voting on the action he was acting in his legislative capacity," ignores Providence's allegation that Mayor Deter's "fraudulent actions occurred outside of the legislative setting." Providence maintains that its allegations that Mayor Deter concealed "his intent to fraudulently induce [Providence] into transferring the real property, in exchange for a 10-Year Fire Service Agreement and to only later cancel said Agreements and transfer the [Fire Suppression Agreement] and property to [Wesley Chapel Volunteer Fire Department]" were consistently stated throughout the complaint, and described actions that are not legislative in nature.

¶ 32        In arguing that the Court of Appeals correctly held that he was shielded from Providence's fraud-related claims on the basis of legislative immunity, Mayor Deter begins by arguing that an "overwhelming body of law" as well as "public policy considerations" would support a decision on the part of this Court to recognize the existence of the doctrine of legislative immunity. Mayor Deter also argues that there would be "*no fraud claim* [*in this case*] *without the legislative actions that occurred after* [*Mayor Deter's*] *election*," citing the Court of Appeals decision, *Providence*, 2020 WL 7974274, at \*\*4, given that the "controlling event" around which Providence's fraud claims center is the 28 April 2015 town council vote to terminate the contracts, with this event being clearly legislative in nature. In support of this assertion, Mayor Deter cites *Stephenson*, in which the Court of Appeals held that, "[s]o long as the acts are legislative in nature, [legislative] immunity may extend to voting, and every other

act resulting from the nature, and in the execution, of the office," 136 N.C. App. at 450 (cleaned up), and posits that his actions in "call[ing] the special meeting and set[ting] the agenda" for the 28 April 2015 town council meeting fall squarely within the grant of legislative authority vested in his office.

¶ 33 Although this Court has not directly addressed the doctrine of legislative immunity to date, both the United States Court of Appeals for the Fourth Circuit and the North Carolina Court of Appeals have recognized its existence. Similarly, the United States Supreme Court has determined that "state and regional legislators" and "local legislators" are entitled to federal legislative immunity, since "the rationales for such immunity are fully applicable to local legislators[,]" *Bogan v. Scott-Harris*, 523 U.S. 44, 49 (1998), and "the exercise of legislative discretion should not be inhibited by judicial interference or distorted by the fear of personal liability[,]" *id.* at 52. Finally, Providence has not contended that we should refrain from recognizing the doctrine of legislative immunity. As a result, we hold that legislative immunity is a recognized bar to claims against North Carolina public officials.

¶ 34 According to the Court of Appeals, local officials are immune from suit if "(1) . . . they were acting in a legislative capacity at the time of the alleged incident; and (2) their acts were not illegal acts." *Vereen*, 121 N.C. App. at 782 (citing *Scott v. Greenville County*, 716 F.2d 1409, 1422 (4th Cir. 1983)). An elected official may, however, be held liable in his or her individual capacity if his or her actions were

malicious, corrupt or outside the scope of his or her official duties, even if they were legislative in nature. *See Epps v. Duke Univ., Inc.*, 122 N.C. App. 198, 204–05 (1996). "Whether an action is legislative or administrative has been determined on a case by case basis," with the Fourth Circuit having treated "eliminating a position for budgetary reasons" as legislative, while treating decisions involving "hiring, firing and other employment decisions [as] administrative and not deserving of legislative immunity." *Vereen*, 121 N.C. App. at 783. In addition, the Fourth Circuit has held that governmental officials cannot claim legislative immunity for "acts such as bribery which are obviously not in aid of legislative activity." *Scott*, 716 F.2d at 1422 (cleaned up). Finally, in *Bogan*, the United States Supreme Court held that a city council-member's decision to vote for the adoption of a particular ordinance was "quintessentially legislative" and that a mayor's "introduction of a budget and signing into law an ordinance also were formally legislative," despite the fact that the mayor "was an executive official," given that "officials outside the legislative branch are entitled to legislative immunity when they perform legislative functions." 523 U.S. at 55.

¶ 35 After carefully reviewing the record, we hold that Mayor Deter's actions in calling the 28 April 2015 town council meeting and setting the agenda for that meeting constituted legislative actions. Like the activities held to be protected in *Bogan*, Mayor Deter's acts were "formally legislative" in that they were within his

discretion as an elected official, they were undertaken as a part of the execution of his mayoral duties, and they were related to the making of legislative decisions. *See Bogan*, 523 U.S. at 55. Although certain of the allegations that Providence has made in support of its fraud-related claims describe events that occurred before Mayor Deter's election, his alleged conduct would not have resulted in any injury to Providence in the absence of the legislative acts of calling a town council meeting to vote to terminate the contracts, placing the issue of contract termination on the agenda, and calling for a vote on that issue. As a result, we hold that the trial court erred when it denied Mayor Deter's motion to dismiss the fraud-related claims that had been lodged against him on the basis of legislative immunity.

### III.    Conclusion

¶ 36        Thus, for the reasons set forth above, we hold that the Court of Appeals did not err in deciding that the Town was shielded from Providence's fraud-related claims on the basis of governmental immunity given that the Town's actions in entering into the Fire Suppression Agreement, the Interlocal Agreement, and the Sale and Lease-back Agreement involved the governmental activity of providing fire protection services and cannot be separated into multiple segments for the purpose of determining whether the Town was performing a governmental or proprietary function. In addition, we hold that the Court of Appeals did not err in holding that Mayor Deter was shielded from Providence's fraud-related claims on the basis of

legislative immunity given that his actions during the period leading up to and during the 28 April 2015 town council meeting were undertaken as part of his discretionary legislative duties as mayor. On the other hand, as we have already noted, Providence's claims for breach of contract and claims alleging deprivation of property in violation of due process remain pending before the trial court. As a result, the Court of Appeals' decision is affirmed, with this case being remanded to the Court of Appeals for further remand to Superior Court, Union County, for further proceedings not inconsistent with this opinion.

AFFIRMED.

Justice EARLS concurring in part and dissenting in part.

Firefighting is a hallmark governmental function. In North Carolina, "[m]unicipal corporations are specifically authorized to organize and maintain fire departments," and "[t]he organization and operation of a fire department is a governmental, not a private or proprietary function." *Great Am. Ins. Co. v. Johnson*, 257 N.C. 367, 370 (1962). A municipality, or the entity it contracts with, is thus "entitled to governmental immunity for *conduct performed in the course of fighting a fire*." *Pruett v. Bingham*, 238 N.C. App. 78, 85 (2014), *aff'd*, 368 N.C. 709 (2016) (emphasis added). But not everything a municipality does that is related to firefighting is "*conduct performed in the course of fighting a fire*." Indeed, the basic premise of the governmental immunity doctrine, which hinges on the distinction between governmental and proprietary functions, is that certain actions undertaken by a governmental entity that are at least tangentially connected to a public purpose are, nevertheless, not governmental functions. A town purchasing a copier for use at the fire station is not the same legally as firefighters rushing to the scene of a blaze.

In this case, the Town of Weddington (the Town) asserts that its acquisition of a fire station from Providence Volunteer Fire Department (Providence) is a governmental function because firefighting is a governmental function. The majority takes this self-interested assertion at face value. Yet purchasing a fire station is not necessarily "conduct performed in the course of fighting a fire." Nor is it, as the majority proposes, necessarily the same as "entering into contractual arrangements

for the provision of firefighting services," *ante*, at ¶ 28. The fact that the Town's conduct is firefighting-adjacent is not enough to demonstrate its entitlement to governmental immunity when Providence has "allege[d] facts that, if taken as true, are sufficient to establish a waiver . . . [of] immunity." *Wray v. City of Greensboro*, 370 N.C. 41, 48 (2017) (second and third alterations in original) (emphasis omitted). Accordingly, while I agree with the majority that the mayor of the Town is entitled to legislative immunity, I dissent from the portion of the majority opinion affirming the Court of Appeals' reversal of the trial court's order denying the Town's motion to dismiss Providence's fraud-based claims on governmental immunity grounds.

## I. General sovereign and governmental immunity principles

¶ 39 A municipality's governmental immunity from tort liability is a "judge-made doctrine" deriving from the State of North Carolina's sovereign immunity. *Steelman v. City of New Bern*, 279 N.C. 589, 594 (1971). Sovereign immunity "originated with the feudal concept that the king could do no wrong" under English common law. *Corum v. Univ. of N.C. Through Bd. of Governors*, 330 N.C. 761, 785 (1992). But neither sovereign immunity nor governmental immunity were "a part of the common law of England" that North Carolina "adopted . . . in 1776." *Id.* Rather, the doctrine of governmental immunity appears to have first been recognized by this Court in a nineteenth century decision, *Moffit v. City of Asheville*, 103 N.C. 237 (1889). *See* Trey Allen, *Local Government Immunity to Lawsuits in North Carolina* 3 n.8 (2018).

Presaging modern-day applications of the doctrine, *Moffit* involved a municipality's assertion that it was immune from suit in an action brought by a plaintiff who alleged he was kept in sub-standard conditions in a jail operated by the city. *Moffit*, 103 N.C. at 237. Since *Moffit*, the doctrine has been recognized and repeatedly reaffirmed "on grounds of sound public policy." *Smith v. Hefner*, 235 N.C. 1, 6 (1952).

What those "grounds of sound public policy" actually entail has frequently been left unsaid. We have posited that the doctrine "seems to rest on a respect for the positions of two coequal branches of government—the legislature and the judiciary. Thus, courts have deferred to the legislature the determination of those instances in which the sovereign waives its traditional immunity." *Corum*, 330 N.C. at 785. However, on the whole, we have not much improved on the United States Supreme Court's tautological pronouncement that "[i]t is an axiom in politics, that a sovereign and independent State is not liable to the suit of any individual, nor amenable to any judicial power, without its own consent." *Cohens v. Virginia*, 19 U.S. 264, 303 (1821). We have never explained why it should be an "axiom" that a doctrine so deeply rooted in a pre-Independence understanding of sovereignty and the royal prerogative should be a fixture in the jurisprudence of courts operating in a representative democracy. *Cf. Donahue v. United States*, 660 F.3d 523, 526 (1st Cir. 2011) (Mem.) (Torruella, J., concerning the denial of en banc review) ("[T]he establishment in this country of a republican form of government, in which sovereignty does not repose on any single

individual or institution, made it clear that neither the government nor any part thereof could be considered as being in the same infallible position as the English king had been, and thus immune from responsibility for harm that it caused its citizens.").

¶ 41 Nevertheless, the doctrines of sovereign and governmental immunity have been recognized and implicitly ratified by the legislature. *See* N.C.G.S. § 160A-485(a) (2021) ("Any city is authorized to waive its immunity from civil liability in tort by the act of purchasing liability insurance."); *see also* N.C.G.S. § 115C-42 (2021) ("Any local board of education . . . is hereby authorized and empowered to waive its governmental immunity . . . ."). These doctrines are now "firmly established in our law today, and by legislation ha[ve] been recognized by the General Assembly as the public policy of the State." *Steelman*, 279 N.C. at 594. I do not dispute the continued viability of the doctrines of sovereign and governmental immunity or their availability as a general matter to governmental actors as a defense to certain claims.

¶ 42 Yet the General Assembly has left it largely to the courts to define the circumstances under which a municipality is understood to have waived its governmental immunity in the absence of an express waiver. As the majority correctly explains, this case turns on our application of another judge-made rule: the distinction between private or proprietary functions (for which a municipality is not entitled to governmental immunity) and governmental functions (for which immunity

does apply). Our case law provides some guidance in approaching this question, though we have candidly admitted that "the distinction may be difficult to distinguish at times." *Bynum v. Wilson County*, 367 N.C. 355, 358 (2014). Yet to the extent our recognition and application of the doctrine of governmental immunity is rooted in "sound public policy," those policy considerations should inform our reasoning when we are called upon to apply the doctrine.

¶ 43    I have already noted the relative paucity of legal and policy justifications for the doctrines of sovereign and governmental immunity in our precedents. When asked at oral argument for a "good public policy reason" to allow municipalities to invoke governmental immunity to defend against fraud claims involving the purchase of a building, counsel for the Town responded that withholding governmental immunity would dissuade qualified individuals from serving in government, "chill" the government's ability to make decisions on difficult policy issues, and open up the floodgates to litigation challenging every governmental decision that any citizen disagrees with. Addressing the federal doctrine of sovereign immunity, one prominent scholar noted a variety of plausible policy justifications including "protecting government treasuries from the costs of damage suits," Erwin Chemerinsky, *Against Sovereign Immunity*, 53 Stan. L. Rev. 1201, 1217 (2001), "protect[ing] the government from undue interference by the judiciary," *id.* at 1218, the existence of "adequate alternatives" as a remedy for harms in many cases, *id.* at

1219, "curb[ing] bureaucratic power," *id.* at 1222, and "tradition[,]" *id.* at 1223. In a dissent, Justice Lake defended the doctrine of sovereign immunity as "not an un-American concept" emanating from the fundamental principle "that the courts, including this Court, are not the sovereign but the mere instruments of the sovereign, having no inherent powers by Divine Right nor by virtue of superior wisdom or purer ethics, but having only the jurisdiction conferred upon them by the sovereign." *Smith v. State*, 289 N.C. 303, 341–42 (1976) (Lake, J., dissenting).

¶ 44    Whatever water these explanations may hold, there are also countervailing legal and policy reasons for limiting the scope of these doctrines, as this Court has previously acknowledged. For example, in *Corum*, we rejected an effort to invoke sovereign immunity to defend against a claim arising directly under our state constitution. 330 N.C. at 786. We explained that it was "the judiciary's responsibility to guard and protect those rights" enumerated by the North Carolina Constitution, *id.* at 785, and that

> [i]t would indeed be a fanciful gesture to say on the one hand that citizens have constitutional individual civil rights that are protected from encroachment actions by the State, while on the other hand saying that individuals whose constitutional rights have been violated by the State cannot sue because of the doctrine of sovereign immunity.

*Id.* at 786. Although addressing a constitutional claim rather than the tort claim at issue here, *Corum*'s reasoning illustrates how expansive interpretations of immunity doctrines conflict with "the principle that for every injury there is a remedy." *Jackson*

*v. Bumgardner*, 318 N.C. 172, 181 (1986). This principle is enshrined in Article 1, § 18 of the North Carolina Constitution, which proclaims that "[a]ll courts shall be open; every person for an injury done him in his lands, good, person, or reputation shall have remedy by due course of law; and right and justice shall be administered without favor, denial, or delay." Immunity has the effect of shutting the courthouse door to injured parties.

¶ 45    Similarly, in *Smith*, we noted the following arguments against sovereign immunity, a doctrine we acknowledged "often results in injustice":

> [S]ince the public purpose involves injury-producing activity, injuries should be viewed as an activity cost which must be met in the furtherance of public enterprise; that [there] is no control of government activity involved in the typical law suit; it is better to distribute the cost of government caused injuries among the beneficiaries of government than entirely on the hapless victims; although the government does not profit from its activities, the taxpayers do, so the taxpayers should bear the cost of governmental tort liability.

289 N.C. at 313 (quoting Kenneth Culp Davis, *Sovereign Immunity: The Liability of Government and its Officials* 17 (1975)). Because of sovereign immunity and its derivatives, North Carolinians' "rights can be violated, but individuals are left with no remedies." Chemerinsky, *Against Sovereign Immunity* at 1213. The judiciary must grapple with the "inherent tension" between ensuring that rights can be vindicated and legal injuries remedied "while also respecting the doctrine of sovereign [and governmental] immunity." *Craig ex rel. Craig v. New Hanover Cnty. Bd. of Educ.*, 363

N.C. 334, 339 (2009).

¶ 46     The upshot of this recap of the origins of sovereign and governmental immunity is that reflexively expanding the scope of these doctrines whenever they are invoked comes at a cost. When courts are called upon to examine an assertion of immunity in a new context, we should be mindful that recognizing an immunity defense may diminish the judiciary's capacity to protect North Carolinians' rights and ensure that legal injuries can be remedied. Unfortunately, for the reasons explained below, the majority's imprecise application of the test used to distinguish between governmental and proprietary functions ignores these considerations and leads it to the erroneous conclusion that the Town is immune from suit under the circumstances of this case.

## II.     Distinguishing between governmental and proprietary functions

¶ 47     If the Town had been engaged in a governmental function when it acquired the property from Providence, then it could successfully assert immunity as a defense to Providence's fraud claims; if the Town was engaged in a proprietary function, it could not. *See, e.g.*, *Meinck v. City of Gastonia*, 371 N.C. 497, 502–03 (2018). A governmental function is "[a]ny activity of the municipality which is discretionary, political, legislative, or public in nature and performed for the public good [o]n behalf of the State rather than for itself." *Britt v. City of Wilmington*, 236 N.C. 446, 450 (1952). By contrast, an "activity" that "is commercial or chiefly for the private advantage of the compact community . . . is private or proprietary." *Id.*

To distinguish between governmental and proprietary functions, courts consider three factors. First, as a threshold matter, we ask "whether our legislature has designated the *particular* function at issue as governmental or proprietary." *Est. of Williams ex rel. Overton v. Pasquotank Cnty. Parks & Recreation Dep't*, 366 N.C. 195, 200 (2012) (emphasis added). If the legislature has designated the "*particular* function" as governmental, the inquiry ends; if not, we proceed to the second factor, whether "the undertaking is one in which *only* a governmental agency could engage." *Id.* at 202. Third, if a "particular service can be performed both privately and publicly, the inquiry involves consideration of a number of additional factors, of which no single factor is dispositive," including "whether the service is traditionally a service provided by a governmental entity, whether a substantial fee is charged for the service provided, and whether that fee does more than simply cover the operating costs of the service provider." *Id.* at 202–03 (footnotes omitted).

The majority correctly recounts the three-part test established in *Estate of Williams*. But the majority goes astray in applying it. Specifically, the majority's analysis rests on a critical elision that confuses the general activity the Town was engaged in, providing fire services to its residents, with the specific activity that forms the basis for Providence's complaint, acquiring property. In addition to being factually inaccurate, the majority's substitution of the general for the specific is in significant tension with the guidance this Court provided in its most recent case

applying the *Estate of Williams* test, *Meinck v. City of Gastonia.*

¶ 50        The majority largely adopts the Town's characterization of the general activity it was engaged in—providing fire services to its residents—and makes the Town's characterization the linchpin of its analysis. While the majority notes the difference of opinion between the trial court and the Court of Appeals regarding the level of generality at which to assess the conduct at issue in this case, the majority ultimately chooses to describe the Town's activities as "fire protection services," *ante*, at ¶ 25, or "entering into contractual arrangements for the provision of fire protection services," *id.*, at ¶ 28, or "the provision of fire protection services," *id.* In support of this characterization, the majority relies on the trial court's finding that the Fire Suppression Agreement, the Interlocal Agreement, and the Sale and Lease-back Agreement were "in actuality, so integrated, one with the other, as to arguably constitute a single, integrated agreement." *Id.* at ¶ 29. The interlocking nature of these agreements does, admittedly, make this a closer case. But governmental functions and proprietary functions are often intertwined, and courts must drill down to assess the particular "nuanced action" at issue when considering an immunity defense. *Williams*, 366 N.C. at 202. Here, the specific "nuanced action" at issue is the Town's acquisition of Providence's property: that is the action contemplated by the Sale and Lease-back Agreement and the action during which Providence alleges the Town acted fraudulently.

As we explained in *Meinck*, "even when the legislature has designated a *general* activity to be 'a governmental function by statute, the question remains whether the *specific* [activity at issue], in this case and under these circumstances, is a governmental function.' " 371 N.C. at 513–14 (alteration in original) (emphasis added) (quoting *Williams*, 366 N.C. at 201). Close examination of the *specific* activity a municipality is engaged in is necessary to preserve the distinction between governmental and proprietary functions because, at a certain remove, almost every activity a municipality undertakes is connected to a governmental function in some way. Thus, in *Meinck*, immunity was available not simply because the legislature had authorized municipalities to engage in "urban redevelopment activities undertaken to promote the health, safety, and welfare of North Carolina citizens" but also because "the uncontroverted evidence" established that "that defendant's lease of the historic property to the nonprofit Art Guild in order to promote the arts in the downtown area was a valid urban redevelopment and downtown revitalization activity." *Id.* at 517. The specific activity (leasing property) was indisputably and in actuality closely connected to a general activity (urban redevelopment) that was a governmental function.

By contrast, in this case, it is very much disputed that the Town's specific activity of acquiring property was closely connected to the general activity of providing fire services. Providence alleges that the Town did not need to acquire its

fire station in order to contract with a volunteer fire department to provide fire protection services to its residents because until the challenged acquisition, the Town was able to contract for fire protection services without owning its own fire station. Providence also alleges that the purpose of the Sale and Lease-back Agreement was to allow the Town to obtain a "significant economic advantage" by acquiring a property that was valued at $1,595,000.00 for $935,000.00. Of course, as the trial court noted, "attempting to obtain significant and valuable property . . . by way of a sale and lease back" is the kind of activity that "can be performed both privately and publicly."

¶ 53        The majority responds that "[u]nder the logic of Providence's position, a municipality's decision to purchase fire protection equipment, such as fire trucks, hoses, and turnout gear, on the commercial market would be rendered proprietary even though the resulting costs were necessarily incurred for the purpose of making a service that units of local government have traditionally provided, that benefits all residents, and that does not provide an economic return to the municipality, available." *Ante*, at ¶ 30. That is a misstatement of Providence's argument. If, as in *Meinck*, the "uncontroverted evidence" established that the Town purchased "fire trucks, hoses, and turnout gear" that was used by firefighters employed by the Town or an entity it contracted with for the provision of fire services, then I would agree that the Town was engaged in a governmental function. Yet if a plaintiff alleged that

the Town had provided fire protection services to its residents for fifty years without ever itself purchasing "fire trucks, hoses, and turnout gear" and that the Town was reselling the goods it had purchased to another municipality at a significant markup, then the Town could not win dismissal of the plaintiff's claims simply by asserting that "fire trucks, hoses, and turnout gear" are generally things related to fire protection services.

¶ 54    Ultimately, the majority's choice to describe the Town's actions at a higher level of generality dictates the outcome of its application of the *Estate of Williams* factors. The majority is correct that there are numerous statutory and other indicia demonstrating that providing fire protection services or contracting for the provision of fire protection services is a governmental rather than proprietary function. Once the majority decides that the Town is engaged in providing fire protection services, the conclusion that it was performing a governmental function is inevitable. *See, e.g., State ex rel. E. Lenoir Sanitary Dist. v. City of Lenoir*, 249 N.C. 96, 100–01 (1958) ("In operating a water system to provide fire protection and kindred services it is acting in a governmental capacity."); *cf. Valevais v. City of New Bern*, 10 N.C. App. 215, 219 (1970) (describing "the furnishing of fire protection" as a "governmental function").

¶ 55    Yet Providence has alleged that the specific act the Town engaged in was part of a savvy but pretextual real estate investment scheme, rather than part of a genuine effort to provide residents with a vital governmental service. Providence has

"allege[d] facts that, if taken as true, are sufficient to establish a waiver . . . [of] immunity." *Wray*, 370 N.C. at 48 (second and third alterations in original) (quoting *Fabrikant v. Currituck County*, 174 N.C. App. 30, 38 (2005)). At this stage of the proceedings, there is a disputed factual question regarding why the Town chose to engage in the specific activity of acquiring property from Providence. Accordingly, I would reverse the Court of Appeals' reversal of the trial court's denial of the Town's motion to dismiss. The majority's decision to credit the Town's naked assertion that the challenged acquisition was necessary to achieve a governmental function allows a municipality to obtain governmental immunity simply by claiming governmental immunity, without establishing the necessary factual prerequisite.

## III.    Conclusion

While the majority is correct that Mayor Deter was entitled to legislative immunity, the majority errs in concluding that the Town was entitled to governmental immunity at this stage of the case. In my view, the requisite "fact intensive inquiry" has not been conducted and the allegations of the complaint, if true, are sufficient to demonstrate that the Town was engaged in a proprietary function when it acquired the fire station from Providence. *Williams*, 366 N.C. at 203. The majority's application of *Meinck* and *Williams* risks swallowing the rule those cases articulated by shielding all conduct relating to a governmental function from tort liability, no matter how tenuous and tangential the connection between the

particular activity and a general governmental function. Extending the doctrine of governmental immunity to protect the Town under these circumstances at this stage of the proceedings is both inconsistent with our precedents and with the broader considerations that should inform our consideration of "this judge-made doctrine." *Steelman*, 279 N.C. at 594. As Justice Blackmun sagely noted, "[i]t is revolting to have no better reason for a rule of law than that so it was laid down in the time of Henry IV." *Bowers v. Hardwick*, 478 U.S. 186, 199 (1986) (Blackmun, J., dissenting) (alteration in original) (quoting Oliver Wendell Holmes, The Path of the Law, 10 Harv. L. Rev. 457, 469 (1897)). The majority errs in unnecessarily expanding such a rule here. Accordingly, I respectfully dissent from that part of the majority's opinion.

Justice BARRINGER concurring in part and dissenting in part.

I agree with the majority that the mayor's actions were protected by legislative immunity. However, I disagree with the majority's interpretation of Providence's complaint. Instead, I join Section II of Justice Earls' opinion, which explains why, when the complaint is viewed in the light most favorable to Providence, the Town is not entitled to governmental immunity. According to the complaint, the reason the Town committed fraud was not for the purpose of obtaining fire services but rather for the purpose of acquiring Providence's real property and then leasing and selling that real property to a different entity. Accepting that allegation as true, the Town's alleged fraud was a proprietary act, not a governmental one. Accordingly, I respectfully concur in part and dissent in part.

I write separately to stress an important point. Integrity in government is vital for building and maintaining citizens' trust and confidence in their governing bodies. When a governmental entity exercises proprietary functions without the requisite integrity, shielding it in immunity produces a serious injustice. A municipality that chooses to participate in a proprietary function must be held to the same standard as any other business, acting in good faith and free from fraud.

Looking to the allegations in the complaint,[1] Providence alleged that:

---

[1] While this Court reviews motions to dismiss de novo, *Sykes v. Health Network Sols., Inc.*, 372 N.C. 326, 332 (2019), including motions to dismiss on the basis of governmental immunity, *see White v. Trew*, 366 N.C. 360, 362–63 (2013), it still "accept[s] the allegations

147. What wasn't disclosed by the Defendant[ ] Town and Defendant Deter to either P[rovidence] or the general public during the lease negotiations was the ongoing development by the Defendant Deter in his individual and official capacities, of a plan to terminate the [Fire Services Agreement (FSA)] and acquire the property free and clear so that the Defendants could put into action their plan to remove P[rovidence] and replace them, not only in service, but [as] title holder to the property on Hemby Road. . . . .

. . . .

149. . . . At the time the Town acquired the Hemby Station, it realized a significant economic benefit by acquiring a property appraised at $1,596,000.00 for an investment of approximately $935,000.00. Moreover, at the time of the termination of the FSA, the Defendant Mayor claimed that said termination was purely financial, further evidencing the proprietary action of the Town.

. . . .

156. Had P[rovidence] known of the Defendants['] actual intent, P[rovidence] would have never transferred its ownership of Hemby Station to the Defendant Town.

Further, after obtaining the property, the Town did "lease[ ] with an option to purchase the Hemby Fire Station by deed to Wesley Chapel Volunteer Fire Department."

In short, viewed in the light most favorable to Providence, the complaint alleges that the Town's purpose in fraudulently inducing Providence to transfer ownership of the Hemby Station property was not for the purpose of obtaining fire

---

in the complaint as true and view[s] them in the light most favorable to the non-moving party," *Est. of Long v. Fowler*, 378 N.C. 138, 2021-NCSC-81, ¶ 12 (cleaned up).

services for the public. Instead, the complaint alleges that the Town's purpose was to cease Providence's ownership and presence on the Hemby Station property in order to lease and provide an option to purchase the property to a different entity and that in doing so the Town realized a significant economic benefit.

¶ 61        Accepting this allegation as true, the next question is whether the Town's alleged tortious conduct "arose from an activity that was governmental or proprietary in nature" since governmental immunity "covers only the acts of a municipality or a municipal corporation committed pursuant to its governmental functions." *Est. of Williams ex rel. Overton v. Pasquotank Cnty. Parks & Recreation Dep't*, 366 N.C. 195, 199 (2012) (cleaned up). This Court follows a three-step analysis to determine whether an action is governmental or proprietary in nature. *See id.* at 200, 202–03.

¶ 62        In the first step, this Court examines "whether, and to what degree, the legislature has addressed the issue." *Id.* at 200. Here, the Town does not direct this Court to any statute by the legislature designating the acquisition of property for the purpose of selling or leasing it to be a governmental as opposed to a proprietary act. Thus, the Town does not qualify for governmental immunity under this threshold inquiry.

¶ 63        In the next step, this Court examines whether the activity is one that "can only be provided by a governmental agency or instrumentality." *Id.* at 202. Here, acquiring property and then attempting to sell or lease it is certainly not one that can only be

provided by a governmental agency or instrumentality. Instead, acquiring property and then selling or leasing it is a commercial act, one common among businesses in the real estate sector. Thus, accepting the allegations in the complaint as true, the Town's actions do not qualify as governmental under the second step.

¶ 64 Finally, if an activity is one that can be undertaken by both public and private entities, this Court examines additional factors, "of which no single factor is dispositive," such as "whether the service is traditionally a service provided by a governmental entity, whether a substantial fee is charged for the service provided, and whether that fee does more than simply cover the operating costs of the service provider." *Id.* at 202–03 (footnotes omitted). This third step "focuses primarily on revenue, which . . . strongly indicates that an activity runs a high risk of being deemed proprietary if it yields substantial income for a unit of local government." Trey Allen, *Local Government Immunity to Lawsuits in North Carolina*, 28 (2018). After all, this Court has

> long held that a governmental function is an activity that is discretionary, political, legislative, or public in nature and performed for the public good in behalf of the State rather than for itself. A proprietary function, on the other hand, is one that is commercial or chiefly for the private advantage of the compact community.

*Williams*, 366 N.C. at 199 (cleaned up).

¶ 65 Relevant to this third step are the allegations in the complaint that the Town "realized a significant economic benefit" from this transaction and then leased that

valuable property to another entity, Wesley Chapel Volunteer Fire Department, with the option to purchase it. These actions, in the light most favorable to Providence, indicate the Town was acting for commercial or private gain for itself and a third party rather than acting for the public good on behalf of the state. Thus, the factors in the third step support that the alleged fraud arose from a proprietary act by the Town. Because no step has been satisfied, the trial court correctly denied the Town's motion to dismiss.

¶ 66     The allegations in Providence's complaint of the Town's proprietary acts cannot be ignored simply because the contract also happened to be part of the Town obtaining fire services. Admittedly, protecting property from destruction by fire has generally been provided by a governmental agency and promotes the public good. However, even if "an activity may be classified in general as a governmental function, liability in tort may exist as to certain of its phases." *Id.* at 203 (cleaned up). In this case, the phase of fire services that Providence is contesting is the Town's acquisition of the Hemby Station from Providence. According to Providence, the Town's purpose in doing so was not to obtain fire services, but rather was "purely financial" and part "of a plan to . . . acquire the property free and clear so that the Defendants could put into action their plan to remove P[rovidence] and replace them, not only in service, but in title holder to the property on Hemby Road."

¶ 67     Thus, this case is easily distinguishable from *Meinck v. City of Gastonia*, 371

N.C. 497 (2018), where the plaintiff never alleged that the defendant city's stated purpose of revitalizing its downtown area was simply a cover for an otherwise commercial venture. *Id.* at 516. Here, Providence specifically alleged that the Town's stated purpose of obtaining fire services was pretextual and that its real purpose was financial. Indeed, the complaint indicates that if the Town was truly trying to obtain fire services for its citizens, it would have maintained its relationship with Providence instead of terminating it. Complying with the correct standard of review, this Court must accept these allegations as true. *See Est. of Long v. Fowler*, 378 N.C. 138, 2021-NCSC-81, ¶ 12. It cannot blindly adopt the explanation offered by the Town while ignoring the allegations in Providence's complaint, which directly contradict the Town's explanation.

¶ 68 If "a municipal corporation undertakes functions beyond its governmental and police powers and engages in business in order to render a public service for the benefit of the community for a profit, it becomes subject to liability for contract and in tort as in case of private corporations." *Town of Grimesland v. City of Washington*, 234 N.C. 117, 123 (1951). Given the allegations in Providence's complaint, the Town's acquisition of the Hemby Station was a proprietary act, not a governmental one. The trial court properly denied the Town's motion to dismiss, and the Court of Appeals erred in reversing that part of the trial court's decision. Accordingly, I respectfully concur in part and dissent in part.

Chief Justice NEWBY joins in this concurring in part and dissenting in part opinion.